Myron H. Fish and Milo Lee, Appellants, *v.* Elijah M. Roseberry, Appellee.

### APPEAL FROM MERCER.

In actions *ex delicto*, it is seldom that courts will interfere with the finding of juries; but in actions *ex contractu*, where a measure of damages is usually furnished, and the proof and instructions are not properly considered, verdicts will be set aside.
When wheat is sold in the stack, there is an implied warranty, that it is merchantable.

This was an action of assumpsit, to recover the price of one thousand bushels of wheat, brought by appellee against appellants in the Rock Island Circuit Court, and taken to Mercer by a change of venue.

The declaration alleges that the defendants were indebted to plaintiff in the sum of $900, the price of eight hundred bushels of wheat sold, etc.; declaration also contained the common counts.

Plea, general issue.

The plaintiff to maintain the issue on his part, called as a witness, *Horatio Roseberry*, who testified, That he was the son of plaintiff; my father contracted to deliver to Fish and Lee, the defendants, eight hundred bushels of spring wheat, by the first of November, 1855, if possible, or as soon thereafter as it could be threshed and delivered; under this contract: " Rock Island county, October 18th, 1855. I have this day agreed to deliver to Fish and Lee, at the warehouse of Samuel Kenworthy, in Andalusia, eight hundred bushels of spring wheat, within one month if possible, for which I am to receive one dollar and twelve and one-half cents per bushel. E. W. Roseberry." And the same having been presented to and examined by the witness,

he said: " I don't know whether this is the paper," referring to the written contract between the parties.

To which objection plaintiff's counsel stated that said contract was obtained by defendants from plaintiff by fraud, and proposed to prove such fraud by witnesses, showing that defendant, Lee, misread the said contract to plaintiff, he being at the time of the execution thereof, unable to read the same, whereupon witness was further allowed by the court to testify in relation to said contract, as follows, to wit:

" I did not read the paper; that is father's signature; Mr. Lee, one of the defendants, was present; don't know who proposed to reduce the contract to writing. When I came into the house, they were writing; the defendant, Mr. Lee, sat down to write; after writing, he handed the contract to father to sign; he (father) said he could not read it, and looked for his spectacles; could not find them, and would trust to Mr. Lee's honor to read it; Lee then read it over: father refused to sign it; it specified a particular time for delivery, to which father objected, and Lee wrote another contract and read it to father; by its terms, as Mr. Lee read it, father was to deliver eight hundred bushels of wheat at Andalusia, by the first of November if possible, or as soon after as it could be threshed and delivered. In November this contract was made, think it was November—middle of October I should have said, in 1855. Mr. Lee put the paper in his pocket at that time; Mr. Lee came to buy father's wheat; they (Mr. Lee and father) went out to the stacks; I did not go with them to the stacks; Mr. Lee had wheat heads in his hand; they then went to the house, I went also; when I went in they had bargained for the wheat; Mr. Lee was to pay one dollar twelve and one-half cents per bushel, for eight hundred bushels of wheat. The wheat was to be delivered at Kenworthy's warehouse situated on the Mississippi river, about nine miles from my father's house; there was no specified time for the delivery, but to be delivered as soon as possible. I did not hear Mr. Lee say anything about whether satisfied with the wheat or not; he said that he wanted to purchase the wheat that was in the stacks; they were about an hour at the stacks; I went immediately to procure a threshing machine; could get none within three or four weeks; one Powers came on the last day of December to thrash the wheat; commenced New Year's day, 1856; they had many break downs which consumed a good deal of time; they were obliged to stop on account of cold weather, as the hands refused to work on that account; don't know how long this stop was; it was some days I think; the cold weather commenced about the second week in January; they continued threshing off and on during February; they kept

us in suspense on account of the machine breaking. Finished threshing all the wheat the last of February or first of March; we did not haul any wheat in till about the first of April; hauled with two wagons with cattle; got stuck in the mud, then quit till the roads improved; as soon as the roads would permit, commenced again and hauled until seeding time, then quit; in about two weeks commenced again and finished hauling about the first of June; delivered eight hundred and one bushels and some pounds; the wheat did not suffer any from the time we commenced threshing till delivered; the wheat was an average quality of that threshed from the stacks and it was as good when delivered as when threshed; father received no notice to my knowledge, not to deliver the wheat.

First agreement written was to deliver eight hundred bushels of wheat by the first of November, 1855, at Kenworthy's warehouse; the second contract as Lee read it, was to deliver by the first day of November, 1855, if possible, if not, as soon as it could be threshed and delivered; there was no difference in the two contracts, except as to the time of delivery; the written contract was the contract between the parties, but was misread by Lee, as to time of delivery only. I paid particular attention at the time Lee read it that way; father cannot read writing without spectacles; I could have read it; don't remember that my father told Lee that the wheat was good; it was hard getting machines that year; don't know of any machine that could have been had within a month from the date of the contract; could have got a machine from Holliday for a larger price, one cent per bushel; he offered to come in December, if we would give him his price, six cents; he threshed for some of our neighbors; I was out looking for a machine just after Lee was there; did not go to see Holliday at all; we stopped for cold weather, this was the second week in January; the machine was ready then, but we had some trouble about the hands, sometimes the machine was ready when father was not; we stopped three or four days on account of the cold weather; don't know how long we threshed then; cold weather did not stop us after the third week in January; the horse-power breaking, was another cause of stoppage; it took about three weeks to repair it. The crop was about sixteen hundred bushels; I guess we had about half of it threshed by the last week in January.

*James Roseberry* testified: I am son of the plaintiff; reside with him; Lee came to the house about the middle of October; said he would like to purchase wheat; said they were giving one dollar and ten cents per bushel at Rock Island; father wanted one dollar and fifteen cents per bushel; Lee said he would go down to the stacks and look at it; went down and

agreed to give $1.12½ for it; said he thought it was very good wheat, and that he would be able to give that for it; he wrote an agreement and read it over to father; father was not willing to sign it because he did not like the time for delivery; Lee took paper and wrote another, read it, and father signed it. He was to deliver the wheat by the first of November if possible, or as soon after as he could thresh and deliver it; contract was written on blue paper like this, (referring to contract offered in evidence,) and was about the same size. · I heard Lee read it; father tried to find his glasses but could not; he could not see to read it without them; 'twas the wheat in the stack that Lee wished to purchase; this was the wheat delivered. Delivery completed about the first of May; completed threshing all our wheat about the first of March; the roads were bad; did not clean the wheat till after we finished threshing. I did not go expressly for a machine; the one we got did not separate very well; it broke down frequently and sometimes would require a week, and sometimes three or four days to repair it.

After they came back to the house, Lee offered one dollar twelve and one-half; father agreed to take it; the first agreement stipulated that delivery should be by a fixed time. I knew while Lee was writing the last contract, that it would give us more time; Lee read it, that father should deliver the wheat at Andalusia by the first of November if possible, or as soon thereafter as he could get it threshed and delivered, the only difference between the contract offered in evidence, and the way it was read by Lee, was in the time of delivery; Lee said that he wanted to purchase the wheat that was in the stacks; he bought eight hundred bushels of it. There was sixteen hundred bushels in all, one-half of it was threshed by the latter part of January.

*Samuel Kenworthy* testified: Fish and Lee, the defendants, engaged room in my warehouse in September, 1855, for storing wheat. Roseberry delivered a little over eight hundred bushels of wheat for Fish and Lee; about three loads were delivered in April, and the balance in May. In January, I think, Mr. Lee told me that he expected Roseberry to deliver some wheat. I offered one dollar and thirty cents in October for wheat and could not buy it; it may have been after the twentieth; in April and May it was worth eighty cents.

The wheat delivered by Roseberry was damp and musty; it was not merchantable; don't think millers would have paid over sixty or sixty-five cents for it; I supposed I received the wheat as warehousemen would have received it—just as I did, if Lee had never spoken to me about it. The oldest son, Horatio Roseberry, said the wheat was his; I gave him receipts in

his own name for the whole of it, and entered it upon my book as his. I wrote to Fish and Lee and informed them of the condition of the wheat; they answered that they would not have it. I think I did not receive the letter until after all the wheat was delivered, and some fourteen days after I wrote. Wheat raised some twenty or thirty cents per bushel in the space of a week or two in the month of October, 1855, I think after the twentieth; this wheat was not in a condition to keep without extraordinary care and attention; I specified this in the receipts. Roseberry, the plaintiff, afterwards told me to dispose of it the best way I could; the fore part of February the roads were good, the latter part they were rather soft, from Andalusia to Roseberry's; there might have been three days that it would have been bad hauling wheat. In March the roads were not so good. We received more wheat in April than any other month; I think the last of this wheat came in on the 6th of May; Roseberry, the plaintiff, said Mr. Lee would not take the wheat; I told him it would not keep without much trouble; he told me to do the best I could with it; Horatio Roseberry claimed all the wheat; the receipts were given in his name; old Roseberry drew none of it.

*Horatio Roseberry* re-called: The wheat I delivered did not belong to me, it was my father's; I lived with him and worked on his farm. I might have said to Kenworthy that it was my wheat; if I haul a load to town, I call it mine; I think I said it was father's wheat, but I am not certain.

Defendant then called *E. R. Powers:* I threshed for plaintiff in '56; threshed through the month of January, and but little in February; threshed three hundred bushels the first week; about the 20th of January we had 1,176½ bushels threshed; we were hindered by plaintiff many days; we had to run half-handed; machine hands had to fill the place of Roseberry; we had three small breaks that required about three hours each to repair; were not hindered any for two weeks up to the 20th; if plaintiff had furnished the hands he ought to have furnished, we could have threshed at the rate of one hundred and fifty bushels per day; I should not consider the roads very bad the latter part of January; my teams were on the roads then for about four weeks, and there was nothing to prevent hauling; when we quit threshing the roads were sloppy, but the ground was frozen underneath; the first obstruction to hauling was after the 14th of March; I told Roseberry that if he did not get away his wheat, that probably Fish and Lee would not take it; said he was not particular whether they did or not; thought that he could get better price, that there was no danger of the Russian war ceasing, and that wheat would come up

before harvest, and he had no doubt would be worth one dollar and fifty cents. He had some very good wheat and some very poor wheat; it had been wet and badly frozen; out of 1,600 bushels, I should think there might have been fourteen hundred that was damaged; as we threshed the wheat, wagons hauled it away, the good to one place and the bad to another.

*Robert Whittaker* testified: We commenced .threshing the first day of January; the stacks of wheat had taken considerable wet and were frozen on the outside; there were several threshing machines in that neighborhood; this job was our first that winter; we could have threshed the wheat in November or December, if notified long enough beforehand. I lived about four miles from Roseberry's. Holliday had a threshing machine; he lived about a mile and a half from plaintiff's.

*David E. Morse* testified: I assisted in threshing plaintiff's wheat; some was in good condition, some badly frozen; I was there two days; think teams were hauling wheat from that neighborhood to Andalusia in February and March; think I delivered some in February; there were a number of machines around there; I saw this wheat at Andalusia; it was musty and unmerchantable; was at Roseberry's house about the first of May; Horatio Roseberry and Robert Harrington were there; I examined the wheat and said it was damp; they answered, yes; I asked if they had mixed the wheat, they said they had run the poor wheat through the wind mill, and taken out what ice they could, then mixed it with the good wheat; the bad would spoil the good.

*Joseph T. Cooper* testified: I assisted in threshing this wheat; about one-fourth of it was in bad condition; about one thousand bushels was threshed by the twentieth of January; we were hindered by Roseberry; could have threshed from one hundred and fifty to two hundred bushels per day with full hands; there was no difficulty in getting machines in the fall of 1855. Roseberry's sons refused to work, on account of the cold; don't know of any one else who did.

*L. A. Chabat* testified: It was May, 1856, that I first saw this wheat; it was musty, damp and unmerchantable.

*Nelson Sherwood* testified: I have known Lee and Roseberry for four years; about the 12th of May, 1856, plaintiff said he had eight hundred bushels of wheat in Kenworthy's warehouse to sell, that he had once sold it to Fish and Lee, but did not deliver it when he contracted to, and they would not have it, and that he wanted to sell to some one else; he said that Lee had scratched out part of the contract and added a part so as to alter it.

The court gave the following instructions for the plaintiff:

1. If from the evidence in this case, the jury believe that, on or about the 18th day of October, A. D. 1855, the plaintiff in this suit contracted to sell to the defendants, 800 bushels of wheat, out of wheat then in the stack upon plaintiff's premises and unthreshed, and that by the terms of such contract, said plaintiff was to deliver such wheat at Andalusia, at the warehouse of Samuel Kenworthy, by the first day of November, then next and following, if possible, or as soon thereafter as said plaintiff could thresh and deliver said wheat, and that the plaintiff, after such 18th day of October, made reasonable and proper effort to deliver such wheat at Andalusia as aforesaid, and did within a reasonable time thereafter, deliver said 800 bushels at the place provided for in the contract, then the defendants are liable to pay said plaintiff the price agreed upon by said parties as the price of said wheat, provided the plaintiff used proper care in preserving said wheat from harm before delivery, and delivered said defendants an average quality of wheat threshed from plaintiff's stacks, mentioned at the time said contract was made.

2. If from the evidence in this case, the jury believe that the plaintiff contracted to sell, and the defendants agreed to buy, 800 bushels of wheat, which wheat was to be threshed from and out of stacks of wheat that plaintiff then had on hand, then the law would imply that such wheat was to be of an average quality, as compared with the entire quantity in such stacks, and it would make no difference whether such wheat was merchantable or not, as the defendants, under such circumstances, would receive the precise article they contracted for, and would have no right to complain, unless the plaintiff did or permitted some act or thing, by which the average quality of said wheat was impaired.

3. If from the evidence, the jury believe that the plaintiff was induced by the defendants or either of them, to sign the written contract offered in evidence, by the fraud and circumvention of either of said defendants, then the plaintiff in this case is permitted to prove the true contract between the parties by parol, and if under such circumstances the jury believe, from the evidence, that the plaintiff has *reasonably* performed such parol contract, if found to exist in respect to the sale and delivery of said 800 bushels of wheat at Andalusia, then the plaintiff is entitled to recover in this suit, provided that in other respects the plaintiff has performed his part of said parol contract.

4. If from the evidence, the jury believe that the parties to this suit extended the time for the delivery of said wheat, they

might lawfully do so, whether such contract was in parol or in writing, and the evidence of such extension may be inferred from circumstances proven to exist. Thus, if from the evidence, the jury believe that Lee, one of the defendants, in January, 1856, expressed a willingness to receive said wheat from the plaintiff, or directed his warehouseman to do so, it is proof tending to show that the time of the delivery was extended beyond the time mentioned in the written contract.

5. If from the evidence in this case, the jury believe that the defendants, or either of them, on or about the 18th day of October, 1855, by fraud and circumvention, induced the plaintiff to sign a written contract for the sale and delivery to them of 800 bushels of wheat, then the jury are bound by the law of the land to disregard such written contract, utterly and entirely, when offered in evidence as proof of such contract; and if, in this case, the jury, from the evidence, believe that the defendants or either of them, when reading to the plaintiff (being unable to read) the written contract offered in evidence, misread the same in any material part, and thus induced the plaintiff to sign said contract, then such contract is not binding upon the plaintiff, and is wholly void as to him.

6. If from the evidence in this case, the jury believe that Lee, one of the defendants, in reading to the plaintiff the contract offered in evidence, (he, the plaintiff, being then unable to read the same,) materially misread such written contract, as to the time of the delivery of the wheat spoken of in said contract, and thus induced the plaintiff to sign the same, such an act on the part of Lee would vitiate and render void such contract as to the plaintiff in this suit.

To the giving of all which instructions the defendants excepted, which exception the court overruled and gave said instructions.

The defendants then requested the court to instruct the jury as follows:

1. The court will instruct the jury that they are the sole judges of the credibility due the testimony of all witnesses testifying before them, and are not bound to believe that of any witness whom they believe unworthy of credit, notwithstanding the character of such witness for truth and veracity, has not been formally impeached by the testimony of any other witness.

2. A witness who makes knowingly contradictory statements in regard to any material fact in issue before them, is unworthy the credit of a jury.

3. The court will instruct the jury, that if they believe from the evidence, that plaintiff admitted that he had sold the wheat to defendants, but that he had not delivered it when he

agreed to, that defendants were not bound to receive it, they will find for the defendants. ·

4. The court will instruct the jury that the admissions of the plaintiff are evidence against him.

[*: The court will instruct the jury, that in no event were the defendants bound to receive unmerchantable wheat of the plaintiff.

The court will instruct the jury, that if they believe from the evidence, by the admissions of plaintiff, that he had not delivered the wheat in the time required by the contract, they will find for the defendants.

5. If the jury believe, from the evidence, that the plaintiff contracted to deliver 800 bushels of wheat within one month from the 18th day of October, 1855, at Kenworthy's warehouse in Andalusia, if possible, and that it was reasonably possible to do so, and that plaintiff did not deliver said wheat within that time, then the jury must find a verdict for the defendants, unless they find that defendants afterwards accepted the said wheat under same contract.

6. If the jury believe, from the evidence, that plaintiff contracted to deliver 800 bushels of spring wheat at Andalusia, at Kenworthy's warehouse, by the first day of November, A. D. 1855, if possible, if not, as soon after as it could be threshed and delivered, and that it was not possible to deliver said wheat by the said first of November, then the jury must believe that the plaintiff used all diligence and exertion in getting the same threshed and delivered as soon after said first day of November, A. D. 1855, as possible, or the plaintiff cannot recover.

7. The law is, that the wheat to be delivered on a contract to deliver a certain number of bushels of wheat, is to be of a fair, merchantable quality, and therefore if the plaintiff, under the contract, only delivered wheat which was not of a fair, merchantable quality, he cannot recover upon said contract.

8. Wheat of a fair, merchantable quality, means good fair wheat in market, without reference to whether the season has generally damaged wheat or not.

9. A contract for the purchase of 800 bushels of wheat to be threshed and delivered by the seller, is not a purchase of the unthreshed wheat, and such wheat would remain the property of the seller until the same was delivered under and according to the contract.

10. If the jury believe, from the evidence, that there was an extension of the time for the delivery of said wheat, by the said defendants, then the jury must further believe, from the evidence, that the wheat was delivered in strict compliance with

the terms of said extension, otherwise the jury must find for defendants.

And further; the mere statement of defendant to Kenworthy, that he expected Roseberry would deliver some wheat, is not of itself evidence of such extension.

And the court then gave all said instructions as asked by the defendant, except the 3rd, 4th and 6th, and then and there refused to give the said 3rd, 4th and 6th instructions as above asked, but modified the same. (Which instructions as modified are in the words and figures following) :

3. The court will instruct the jury, that if they believe, from the evidence, that plaintiff admitted that he had sold the wheat to defendants, but that he had not delivered it when he agreed to, that defendants were not bound to receive it, and that defendants did not receive it, and if from the evidence they believe such to be the fact, they will find for the defendants.

4. The court will instruct the jury that the admissions of the plaintiff are evidence against him; but that all the admissions of a party made at the same time and in the same conversation, both for and against himself, must be considered and weighed by the jury.

4. The court will instruct the jury, that in no event were the defendants bound to receive unmerchantable wheat of the plaintiff, unless they believe, from the evidence, that the defendants purchased certain wheat of plaintiff of a different quality after a fair examination of its quality, or purchased certain wheat then in stacks, with a fair opportunity of examining its quality. The court will instruct the jury, that if they believe, from the evidence, by the admissions of plaintiff or otherwise, that he had not delivered the wheat in the time required by the contract, they will find for the defendants.

6. If the jury believe, from the evidence, that plaintiff contracted to deliver 800 bushels of spring wheat at Andalusia, at Kenworthy's warehouse, by the first day of November, A. D. 1855, if possible, if not, as soon after as it could be threshed and delivered, and that it was not possible to deliver said wheat by the said first day of November, then the jury must believe that the plaintiff used all reasonable diligence and exertion in getting the same threshed and delivered as soon after said first day of November, A. D. 1855, as was reasonably possible, or the plaintiff cannot recover.

To the modification of said instructions, the defendant excepted, which exceptions the court overruled, and gave the said instructions, as modified.

After which the jury returned a verdict for the plaintiff, and

20

assessed his damages at nine hundred dollars. The defendants entered their motion for a new trial, for the following reasons :

1st. That the court gave to the jury in the case, on behalf of and for the plaintiff, erroneous instructions.

2nd. That the verdict of the jury was against the instructions of the court in the cause.

3rd. That the verdict of the jury was contrary to the evidence in the case.

4th. That William I. Nevins, one of the jurymen who tried the cause, was, when said case was tried, over sixty years of age.

Which motion the court overruled, and rendered judgment on the verdict. The defendants excepted, and prayed an appeal.

The errors assigned are :

1. The court erred in giving each of the instructions asked for by defendant.

2. The court erred in modifying defendants' instructions.

3. The court erred in overruling motion for a new trial.

4. The court erred in rendering the judgment.

B. C. COOK, for Appellants.

BEARDSLEY & SMITH, for Appellee.

BREESE, J. We are satisfied on an examination of the facts of this case and the instructions of the court, that a new trial should be awarded. It is true, as a general rule, courts will not interfere to set aside verdicts, where it is believed the jury has decided against the weight of evidence, and against the instructions of the court, provided it appears from the whole record, that substantial justice has been done. This is pre-eminently the rule in actions *ex delicto*, where juries have no well assigned limits within which to bound their judgments. It is somewhat different in cases *ex contractu*. Such cases furnish of themselves the rule, and whenever juries transgress it, their verdicts should be unhesitatingly set aside.

The meaning of the contract in this case, taken in its most favorable aspect for the appellee, is, that he should make all reasonable efforts to deliver the wheat if not by the first of November, as soon after that day, as by the exercise of reasonable diligence he would have been enabled to do. The proof is, we think, conclusive, by such exercise, he could have delivered the whole quantity contracted for by the first, or middle of December. A man really desirous of performing such a contract, could have delivered the wheat, and without extraordinary exertion, by the first day of December. This the whole testimony fully shows. *Eldridge* v. *Rowe*, 2 Gilm. R. 96; *Taylor*

v. *Beck*, 13 Ill. R. 386. Speculating upon the chances of the war with Russia being prolonged which would raise the price of wheat to one dollar and fifty cents per bushel, may account, perhaps, for his long neglect in the delivery. He has shown no diligence or desire to perform the contract.

The proof shows also, that as late as May 12th, appellee did not consider that he had performed the contract, as at that time he offered to sell the wheat then in the warehouse, stating that he had once sold it to appellants, but had not delivered it according to contract,—that they would not have it, and wanted a purchaser. *Bannister* v. *Read*, 1 Gilm. R. 92–100.

Besides, it is proved, the wheat when delivered, was damp and unmerchantable, not such wheat as the appellants had contracted to purchase. Exposed the whole winter and part of spring to the weather, it had ceased to be such an article as they had contracted for in the preceding October. When in the stack, there was an implied warranty, that the wheat was merchantable. *Misner* v. *Granger*, 4 Gilm. R. 69.

There is proof also, and well worthy the attention of the jury, that the wheat was actually the property of Horatio Roseberry, the principal witness in the cause. The warehouseman receipted to him for it, he claiming it as his own, at the time of delivery, and it was so entered on the books.

Under the contract as proved, the greatest degree of diligence was required of the appellee, to deliver the wheat at the earliest possible day. The first instruction, seems to be based upon a less degree of diligence as requisite on his part, and if it deteriorated, before its delivery, the loss must fall on the appellants. A more unjust proposition could not be stated. The jury are in effect told, that the appellee may idle away his time, his sons refuse to work when they might work,—no great effort be made to obtain machinery for threshing, and no care taken to protect it from the weather, and if thereby, there is a loss by injury to the wheat, the appellants must bear the loss. This is neither law, justice or good sense.

The appellee has made out no case whatever against the appellants. He has neither performed his contract, nor endeavored to perform it. The appellants have never received the wheat, nor are they shown to have been in fault ; and no verdict, under the proof in the record should be rendered against them. Parties should be held to a reasonably strict performance of their contracts, as well for the delivery of wheat as any other article, and cannot be permitted unusual delay, waiting for a rise in the price, and failing in that, deliver the article when the price is down. The instructions given on behalf of appellants were substantially correct, as well those modified, as those originally

asked, but the jury seem to have disregarded them. The justice of the case being wholly with the appellants, the judgment, for the reasons given, is reversed and the cause remanded.

*Judgment reversed.*